UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERNON BRET PADGETT,<br><br>*Plaintiff*,<br><br>v.<br><br>THOMAS J. VILSACK, *et al.*,<br><br>*Defendants*. | Civil Action No. 24-2425 (LLA) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Vernon Bret Padgett brings this action against Thomas J. Vilsack, in his official capacity as Secretary of Agriculture, and the Animal and Plant Health Inspection Service ("APHIS"), alleging violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* in connection with Defendants' determination that they will humanely euthanize Mr. Padgett's consignment of Abyssinian ground hornbills because some have tested positive for Avian Paramyxovirus-1.  ECF No. 1, ECF 5-3.  Mr. Padgett has filed a motion for a temporary restraining order ("TRO") to enjoin Defendants from euthanizing the healthy birds.  ECF No. 5. For the following reasons, the court will **DENY** the motion.

I.     Factual Background and Procedural History

Mr. Padgett operates a small business that imports birds.  ECF No. 1 ¶ 1.  In early August 2024, Mr. Padgett attempted to import twenty-two Abyssian ground hornbills into the United States.  *Id.* ¶ 12, ECF No. 5 ¶ 10.  The birds arrived in a single shipment, and APHIS "[s]taff noted substantial animal welfare concerns on their arrival."  ECF No. 10-1 ¶ 31.

Under 9 C.F.R. § 93.106, imported birds must be quarantined for at least thirty days and tested for communicable diseases.  Mr. Padgett's hornbills are being held at the U.S. Department

of Agriculture's ("USDA") New York Animal Import Center in Orange County, New York. ECF No. 10-1, ¶ 31. The birds are housed either singly or in pairs within "one room of an individual, self-contained barn," where they "share the same air." *Id.*

On August 14, 2024, APHIS informed Mr. Padgett that the hornbills were being denied entry into the United States pursuant to 9 C.F.R. § 93.106 because some of the birds had tested positive for Avian Paramyxovirus-1. ECF No. 5-3. Avian Paramyxovirus-1 can cause "Virulent Newcastle Disease" or "vND" which is a highly contagious and severe disease in birds that is often fatal and for which there is no effective treatment. ECF No. 10-1 ¶ 10. The disease "spreads rapidly among birds kept in close quarters." *Id.* ¶ 11. When testing for vND, APHIS "pulls a representative set of samples from the flock . . . so there is no way to identify which birds specifically test[] positive." *Id.* ¶ 26. "Because vND is a viral disease and easily transmitted [APHIS] . . . considers the whole flock or lot positive if one sample is positive." *Id.*

The United States has eradicated vND and consequently "practice[s] a stamping out policy centered around quarantine and destruction of infected and exposed birds or flocks[] to prevent disease spread." *Id.* ¶ 14. Outbreaks of vND can have a massive impact on trade and the economy because chickens are particularly vulnerable to the disease. *Id.* ¶¶ 15-16. The United States last experienced an outbreak of vND between 2018 and 2020, and it led to the destruction of 1.2 million birds, for which the USDA provided $6.7 million in indemnity to affected owners. *Id.* ¶ 21. Prior outbreaks have been even larger—one outbreak between 1971 and 1974 led to the destruction of 12 million birds and cost $56 million to eradicate. *Id.* ¶ 19. In addition to causing disease in birds, vND can spread to humans and cause conjunctivitis and mild flu-like symptoms. *Id.* ¶ 17.

In light of the positive test, APHIS provided Mr. Padgett with two options: (1) export the hornbills out of the country by August 24, 2024; or (2) have the birds humanely euthanized by

2

APHIS on August 25, 2024.  ECF No. 5 ¶¶ 11, 22.  Mr. Padgett disagreed with this approach and requested that APHIS extend the quarantine.  ECF No. 5-1.  APHIS declined to do so and indicated that it would proceed with humane euthanasia if the birds were not removed by the requisite deadline.  ECF No. 5-2.

On August 21, 2024, Mr. Padgett filed a four-count complaint asserting that Defendants' determination concerning the hornbills violated the APA.  ECF No. 1 ¶¶ 18-26.  The following day, he filed the present motion for a TRO requesting that the court enjoin Defendants from euthanizing the healthy birds.  ECF No. 5.  The court issued an administrative stay during which Defendants were ordered to maintain the healthy birds in quarantine and to refrain from euthanizing them.  ECF No. 8.  The court received full briefing on the matter and held a hearing on August 28, 2024.  ECF Nos. 5, 10, 11.

## II.     Legal Standard

To receive a TRO, the moving party must show (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) (explaining that the legal test for a preliminary injunction and a TRO are the same).  Where, as here, the government is the opposing party, the third and fourth factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In coming to its decision, the court must consider all the factors together.  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 109.

3

### III.     Discussion

The court concludes that Mr. Padgett has failed to carry his burden to receive a TRO. Mr. Padgett has not shown a likelihood of success on the merits or irreparable injury, and the balance of equities does not tip in his favor.

### A.     Likelihood of Success

First, Mr. Padgett must show a likelihood of success on the merits. *Winter*, 555 U.S. at 20. This factor is crucial, and a "movant must raise at least a 'serious legal question on the merits.'" *Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). The court notes that Mr. Padgett never expressly addresses this factor in his motion, which is alone grounds for the court to deny his motion. *See generally* ECF No. 5; *see Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dept. of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011) (explaining that this factor is "often the dispositive one"). The court nonetheless considers all the relevant filings and representations at oral argument in concluding that Mr. Padgett's APA claims are unlikely to succeed.

At this stage, the parties agree that 9 C.F.R. § 93.106(a) controls Defendants' actions with respect to the birds. ECF No. 5 ¶ 16;[1] *see* Aug. 28, 2024 Hr'g Tr. at 6:3-12. In pertinent part, the regulation provides:

> If the birds are found during port of entry inspection or during quarantine, to be infected with or exposed to a communicable disease of poultry, such birds shall be refused entry or shall be held for an additional period in quarantine until determined to be free of evidence of any communicable disease, or shall be otherwise disposed of as directed by the Administrator.

---

[1] Mr. Padgett includes two paragraphs numbered sixteen on page four of his motion, the court is referring to the second. ECF No. 5, at 4.

9 C.F.R. § 93.106(a).  The court finds as a matter of fact that Mr. Padgett's hornbills have all been either infected with or exposed to vND.  The birds "arrived in a single shipment" and are currently housed in the same room, where "[t]hey share the same air and, thus, all are at high risk of transmitting the disease to one another."  ECF No. 10-1 ¶ 31.  An undisclosed number of the birds have tested positive for vND, ECF No. 5-4, at 1, and thus they are infected.  And any non-infected birds have been exposed to the disease by being shipped together and housed together.[2]

Under Section 93.106(a), Defendants have three potential courses of action with respect to "such birds" (meaning those birds that are either "infected" with or have been "exposed" to a disease like vND).  9 C.F.R. § 93.106(a).  They may: (1) "refuse[] [the birds] entry" into the United States; (2) continue to hold the birds for "an additional period in quarantine"; or (3) "otherwise dispose[]" of the birds.  *Id.*  The decision about which course of action to take is within the discretion of the APHIS Administrator.  *Id.* (explaining that the course of action is "as directed by the Administrator"); *see* 7 U.S.C. § 8303(c)(1) ("The Secretary [of Agriculture] may order the destruction or removal from the United States of . . . any animal . . . that has been imported but has not entered the United States if the Secretary determines that destruction or removal from the United States is necessary to prevent the introduction into or dissemination within the United

---

[2] At the hearing, Mr. Padgett questioned why the infected hornbills had not been euthanized or separated from the non-infected birds.  Aug. 28, 2024 Hr'g Tr. at 12:3-7.  Defendants explained that Section 93.106(a) provides for quarantine on an "all-in, all-out" basis, meaning that the entire consignment is treated alike.  *Id.* at 17:11-13 (quoting 9 C.F.R. § 93.106(a)); *see* ECF No. 10-1 ¶ 26 (explaining that APHIS tests representative samples, "so there is no way to identify which birds specifically tested positive" and that it "considers the whole flock or lot positive if one sample is positive").  Mr. Padgett contends that the regulation's "all-in, all-out" language only refers to the timing of quarantine, not how the birds are treated while in quarantine.  Aug. 28, 2024 Hr'g Tr. at 3:6-12.  The court doubts Mr. Padgett's interpretation, but it need not decide the issue because, as explained, all the birds are either infected with or have been exposed to vND.

States of any pest or disease of livestock[.]"); 7 C.F.R. § 2.80(a)(37) (delegating the Secretary's authority under 7 U.S.C. § 8303 to APHIS).

Mr. Padgett would prefer that Defendants pursue additional quarantine instead of humane euthanasia, but he seemingly recognizes that additional quarantine is not mandated by the regulation. *See* ECF No. 11, at 3 (stating that additional quarantine is "authorized"); Aug. 28, 2024 Hr'g Tr. at 9:15-23, 10:9-11.  Mr. Padgett has made his preference known, but Defendants have exercised their discretion to pursue humane euthanasia.  Because Defendants are acting within the scope of their authority, Mr. Padgett is unlikely to succeed on the merits.

### B.     Irreparable Injury

Next, Mr. Padgett must show irreparable injury.  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Mr. Padgett alleges that without a TRO, he "will sustain irreparable loss of the birds," on which he "has spent more than $80,000." ECF No. 5 ¶¶ 22-23.  Economic harm is generally not considered irreparable injury because of the possibility of "adequate compensatory or other corrective relief . . . at a later date." *Wis. Gas Co.*, 758 F.2d at 674 (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  But if the movant can show that he does not have an avenue for later compensatory relief, courts will consider economic harm as a factor in the irreparable-injury analysis.  *See Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011).

Mr. Padgett has failed to make the required showing.  In their opposition brief, Defendants argue that Mr. Padgett solely alleges a monetary loss of $80,000 and "any harm that he stands to suffer is ultimately remediable via a monetary payment." ECF No. 10, at 3-4.  Mr. Padgett could

6

have refuted that in his reply—for example, by noting that monetary damages are not available in an APA suit, *see* 5 U.S.C. § 702 (allowing for relief "other than money damages")—but he did not. Mr. Padgett had the burden to show irreparable injury, and he failed to carry it.

### C. Balance of the Equities and the Public Interest

Finally, Mr. Padgett must show that the balance of equities and the public interest weigh in his favor. As noted, these two factors merge when the government is the opposing party. *Winter*, 555 U.S. at 20; *Nken*, 556 U.S. at 435. Mr. Padgett did not raise this issue in his initial motion, which is alone grounds for denial. *See generally* ECF No. 5; *see Abdullah v. Obama*, 753 F.3d 193, 199 (D.C. Cir. 2014) (explaining forfeiture). In his reply, he argues that the public interest will be served because the hornbills "are likely destined for" zoos and aquariums "that aid in the conservation of the species." ECF No. 11, at 7. Even crediting this equivocal statement about the birds' intended destinations, the public interest in bringing a small number of hornbills into the United States is far outweighed by the significant risks posed by an outbreak of vND. As Defendants explain, previous outbreaks of vND have resulted in the destruction millions of birds and have cost taxpayers over two hundred million dollars. *Id.* ¶¶ 18-21. The United States has been free of vND since 2020, *see id.* ¶¶ 14, 18-21, and Defendants' attempts to prevent another outbreak undoubtedly tips the equities in their favor.[3]

---

[3] Mr. Padgett also argues that the public interest "suffers" when an agency "acts in direct contradiction [of] its own regulations." ECF No. 11, at 7. But as the court has explained, Defendants were acting within the scope of their regulations. *See supra* pp. 4-6.

## IV. Conclusion

For the foregoing reasons, Mr. Padgett's Request for a Temporary Restraining Order, ECF No. 5, is **DENIED**, and the court's administrative stay, established in ECF No. 8, is **LIFTED**.[4]

**SO ORDERED**.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: August 30, 2024

---

[4] In his reply brief, Mr. Padgett seeks an order from this court extending the hornbill's quarantine for a period of thirty days. ECF No. 11, at 7. That request exceeds the scope of a TRO, which may not exceed fourteen days. Fed. R. Civ. P. 65(b)(2). If Mr. Padgett is instead seeking a preliminary injunction, his request is denied for the same reasons explained above.