**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERNON BRET PADGETT,<br>*Plaintiff*,<br>v.<br>BROOKE L. ROLLINS, *et al.*,<br>*Defendants*. | Civil Action No. 24 - 2425 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Vernon Bret Padgett brings this suit against Brooke L. Rollins, in her official capacity as Secretary of Agriculture, and the Animal and Plant Health Inspection Service ("APHIS"). ECF No. 13. He alleges that Defendants acted arbitrarily, capriciously, contrary to law, and in excess of their statutory authority, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by euthanizing his twenty-two Abyssinian ground hornbills that were exposed to Avian Paramyxovirus-1. ECF No. 13. The court previously granted Defendants' motion to dismiss Mr. Padgett's claim for money damages but allowed Mr. Padgett to proceed with his claim for restitution of fees he paid to APHIS. ECF No. 19. Mr. Padgett has now filed a petition for a writ of mandamus. ECF No. 23. He seeks an order directing APHIS to appraise the euthanized hornbills and process his indemnity application so that he may receive compensation for their destruction. ECF No. 23-1, at 1. For the reasons explained below, the court denies Mr. Padgett's petition.

## I. BACKGROUND

The court primarily relies on the following facts from its opinion granting in part and denying in part Defendants' motion to dismiss. ECF No. 19, at 1-3. Mr. Padgett owns and operates a small business that imports birds. ECF No. 13 ¶ 1. In July 2024, he attempted to import twenty-two Abyssinian ground hornbills into the United States. *Id.* ¶ 13. After the hornbills arrived at John F. Kennedy International Airport, a port of entry for imported birds, they were quarantined as required by federal law. *Id.* ¶¶ 14, 18; *see* 9 C.F.R. §§ 93.102(a), 93.106(a). APHIS tested a representative sample of the hornbills for diseases and found that in a pooled sample of five birds, at least one had tested positive for Avian Paramyxovirus-1—otherwise known as "Newcastle disease"—which is a highly contagious and often fatal virus affecting birds and poultry. ECF No. 10-1 ¶ 10; ECF No. 13 ¶¶ 16-18; ECF Nos. 13-1, 13-2. Once "Newcastle disease . . . is found or detected among any birds in quarantine," a federal bird importation regulation requires "all birds in the facility [to] be destroyed or refused entry" into the United States. 9 C.F.R. § 93.106(c)(3)(ii)(E). APHIS concluded that the remaining birds had also been exposed to the disease and therefore notified Mr. Padgett that the birds had been refused entry and that he had two options: (1) export the hornbills out of the country; or (2) have the birds humanely euthanized by APHIS. ECF No. 5 ¶¶ 11, 22.

Mr. Padgett declined both options and initiated this civil action on August 21, 2024. ECF No. 1. He also filed a motion for a temporary restraining order ("TRO") requesting that the court enjoin Defendants from euthanizing the seventeen hornbills in the two samples with birds that had tested negative for Avian Paramyxovirus-1. ECF No. 5. The court issued an administrative stay during which Defendants were ordered to maintain the healthy birds in quarantine and refrain from euthanizing them. ECF No. 8. After the parties briefed the TRO and the court held a hearing on

the motion, the court denied Mr. Padgett's request for a TRO and lifted the administrative stay. ECF No. 12. Soon thereafter, Mr. Padgett was informed by APHIS: "All 22 hornbills have been euthanized and incinerated." ECF No. 13 ¶ 24.

In November 2024, Mr. Padgett amended his complaint, alleging that the imposition of fees for testing, holding, and euthanizing the birds, as well as the failure to provide an additional quarantine for the birds, was arbitrary and capricious, contrary to law, and in excess of statutory authority, all in violation of the APA. ECF No. 13 ¶¶ 25-50. As relief, Mr. Padgett requested compensation for the loss of the healthy birds, return of the fees APHIS had charged, and attorney's fees and costs. *Id.* at 9. Defendants moved to dismiss Mr. Padgett's amended complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), ECF No. 16, arguing that the APA does not waive the United States' sovereign immunity from suits for monetary relief, ECF No. 16-1, at 4. The court construed Mr. Padgett's amended complaint as seeking both money damages and equitable relief. ECF No. 19, at 3-4. It therefore granted Defendants' motion to dismiss Mr. Padgett's request for compensatory relief because sovereign immunity barred that claim, but it denied the motion as it concerned his request for a refund of fees charged. *Id.* at 7.

Mr. Padgett subsequently filed a petition for a writ of mandamus, in which he seeks an order directing APHIS to appraise his hornbills and process an indemnity application according to federal regulations. His mandamus petition is fully briefed, ECF Nos. 23 to 25.

## II. LEGAL STANDARD

A writ of mandamus "compel[s] an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. "[Mandamus] is a 'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (quoting *Ex parte Fahey*, 332 U.S. 258, 259-60 (1947)). A plaintiff

seeking mandamus relief has the burden to establish "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). The first two standards are "equally stringent." *Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023). Relief is warranted only if "the challenged action is 'plainly and palpably wrong as [a] matter of law,'" *id.* (alteration in original) (quoting *U.S. ex rel. Chi. Great W. R. Co. v. Interstate Com. Comm'n*, 294 U.S. 50, 61 (1935)), and "[t]he law . . . not only authorize[s] the demanded action, but require[s] it," *id.* at 715 (first alteration in original) (quoting *U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). Additionally, "[e]ven when the legal requirements for mandamus jurisdiction have been satisfied," a court may grant a mandamus petition "only when it finds compelling equitable grounds." *Am. Hosp. Ass'n*, 812 F.3d at 189 (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)).

## III. DISCUSSION

Defendants make a threshold argument: the petition is improper because Mr. Padgett has not sought leave to amend his complaint to include a mandamus claim. ECF No. 24, at 4 n.1. Mr. Padgett expressly informed Defendants' counsel that he does not intend to amend his operative pleading to seek a writ of mandamus. *Id.*; *see* ECF No. 24-1, at 2 (indicating that Mr. Padgett's counsel did not "intend to amend" and instead wanted to "[f]ile a motion").[1] In Defendants' view, "[t]he absence of any claim for mandamus relief" in Mr. Padgett's amended complaint, ECF No. 13, "is an additional reason [to] deny[]" the mandamus petition, ECF No. 24, at 4 n.1.

---

[1] When citing ECF No. 24-1, the court refers to the CM/ECF-generated numbers at the top of each page rather than any internal pagination.

Mr. Padgett does not respond to Defendants' argument in his reply brief. *See generally* ECF No. 25. The court agrees with Defendants that amendment is required because the mandamus request presents a new claim for relief. The court thus construes Mr. Padgett's petition for a writ of mandamus as a motion for leave to file a second amended complaint and concludes that any such motion would be futile because Mr. Padgett has not established that mandamus is warranted.

### A. Failure to Seek Leave to Amend

Mr. Padgett invokes the Mandamus Act, 28 U.S.C. § 1361, as a basis for his mandamus petition. ECF No. 23-1, at 1. Section 1361 supplies a cause of action for a petitioner seeking a writ of a mandamus. *See Swan v. Clinton*, 100 F.3d 973, 976 (D.C. Cir. 1996) (concluding that the "prerequisites for stating a cause of action under the mandamus statute [were] met"); *see also Wallace v. Sec'y, U.S. Dep't of Homeland Sec.*, 616 F. App'x 958, 959 (11th Cir. 205) (per curiam) ("The Mandamus Act . . . provides a private cause of action for parties related to certain governmental agents and entities' failure to perform prescribed duties . . . ."). It also provides a source of jurisdiction for the court to hear that claim. *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (explaining that the Mandamus Act is a "potential source of jurisdiction" and that the three requirements for obtaining mandamus relief are jurisdictional). Because mandamus is a cause of action, it "must be properly pleaded pursuant to Federal Rule of Civil Procedure 8." *Hills v. Comm'r of Soc. Sec.*, No. 24-CV-1207, 2026 WL 965497, at *1 (W.D. Wash. Apr. 9, 2026) (reviewing a mandamus petition filed as a separate motion rather than as an amended pleading and striking the filing as an improper pleading).

Rule 8 requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Amendments to pleadings are governed by Rule 15, and "[i]t is well settled that a [plaintiff] cannot amend his complaint through motions

briefing." *Sinha v. Blinken*, No. 20-CV-2814, 2021 WL 4476749, at *3 (D.D.C. Sep. 30, 2021). Under Rule 15, a party may amend his pleading once as a matter of course—but only within twenty-one days of serving the pleading or, if a response to the pleading is required, within twenty-one days after the responsive pleading or motion has been filed. *Id.* R. 15(a)(1)(A), (B). Otherwise, he may do so "only with the opposing party's written consent or the court's leave." *Id.* R. 15(a)(2). The court should grant such leave "freely . . . when justice so requires." *Id.* While "it is an abuse of discretion to deny leave to amend unless there is sufficient reason," a court may do so if the amendment would be "'futil[e].'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). And an amendment is futile "if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

Mr. Padgett's petition plainly asserts a new cause of action that is absent from his amended complaint. *See generally* ECF No. 13. Specifically, Mr. Padgett seeks a court order directing a government official to comply with various asserted "non-discretionary duties" that would allow him to obtain indemnification for the loss of his hornbills. ECF No. 23-1, at 1; *see* 28 U.S.C. § 1361 (providing an "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff"). His "request for writ of mandamus cannot simply be appended to a pleading as a matter of course, then seamlessly incorporated into the case." *Hills*, 2026 WL 965497, at *1. "Instead, the case's operative pleading"—here, the amended complaint—"must be properly amended . . . to include the new cause(s) of action." *Id.* Mr. Padgett has expressly disclaimed any interest in doing so, and Defendants have not consented to any amendment. *See* ECF No. 24-1, at 2. His failure to seek leave to file a second amended complaint alone would warrant denying the mandamus petition,

but the court will construe his filing as one seeking leave to file a second amended complaint. *See Nabaya v. Dudeck*, 38 F. Supp. 3d 86, 94-95 n.6 (D.D.C. 2014) (taking a similar approach). Because Mr. Padgett has not satisfied the requirements for obtaining mandamus relief, *see infra* Section III.B, any amendment to add a mandamus claim would be futile, *see Nabaya*, 38 F. Supp. 3d at 94-95 n.6 (after construing the mandamus petition as a motion for leave to amend, explaining that any amendment would be "denied as futile"); *see also Neville v. Burrows*, No. 22-CV-3246, 2024 WL 578986, at *10 (D.D.C. Feb. 13, 2024) ("Such an amendment is unnecessary and would be futile because Plaintiffs' claim also fails if viewed under the Mandamus Act."); *Stone v. U.S. Dep't of State*, No. 21-CV-3244, 2022 WL 4534732, at *10-11 (D.D.C. Sep. 28, 2022) ("deny[ing] as futile" a proposed amendment to include "requests for writs of mandamus" because the plaintiff had not established that the court could grant mandamus relief "for . . . discretionary acts").

**B. Lack of Entitlement to Mandamus**

Any amendment to include a mandamus claim would not survive a motion to dismiss under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6) because Mr. Padgett has not demonstrated that he has a clear and indisputable right to relief or shown why mandamus is appropriate under the circumstances. Mr. Padgett asks the court to "order[] APHIS to appraise the [euthanized] birds and process [an] indemnity application in accordance with [APHIS's] non-discretionary duties" set forth in 9 C.F.R. § 53.1 *et seq.* ECF No. 23-1, at 1. In Mr. Padgett's view, mandamus is warranted because APHIS failed to (1) conduct an appraisal of the hornbills that it euthanized, 9 C.F.R. § 53.3(a); (2) ensure that any appraisal was based on the hornbills' fair market value, *id.* § 53.3(b); (3) use an agency-approved form to document the appraisal, *id.* § 53.3(c); (4) complete the appraisal before the hornbills were euthanized, *id.* § 53.4(a); and

(5) execute "a written agreement to the appraisal[]," which would allow Mr. Padgett to proceed with a claim for compensation, *id.* § 53.10(c). ECF No. 23-1, at 3. Defendants contend that Mr. Padgett lacks a clear and indisputable right to an appraisal for birds denied entry into the United States, that they have no clear duty to process any indemnity application, and that the mandamus petition improperly seeks to relitigate the court's order dismissing Mr. Padgett's APA claim seeking compensation for the loss of the healthy hornbills. ECF No. 24, at 7-9. The court agrees with Defendants. Mr. Padgett has not satisfied the legal requirements for mandamus relief or shown why the court should exercise its discretion to grant such an extraordinary remedy.

Mr. Padgett has no clear and indisputable right to receive an appraisal or have an indemnity application processed—and APHIS has no clear duty to appraise the hornbills or process his claim for compensation—because he has not shown that the appraisal and indemnity regulations apply to his situation. To begin, although Mr. Padgett's hornbills arrived at a port of entry and traveled to a quarantine facility, ECF No. 13 ¶¶ 13, 18, 42; *see* 9 C.F.R. §§ 93.102(a), 93.105(a) (requiring arrival and inspection at a port of entry), they never "enter[ed]" the United States for purposes of the Animal Health and Protection Act, Pub. L. No. 107-171, § 10403, 116 Stat. 495 (2002) (codified at 7 U.S.C. § 8302(4)). An animal "enter[s]" the country if it "move[s] into the commerce of the United States," 7 U.S.C. § 8302(4), whereas it is only "import[ed]" if it is "move[d] from a place outside the territorial limits of the United States to a place within the territorial limits of the United States," *id.* § 8302(7). Mr. Padgett's hornbills were thus "imported" once they entered the territorial limits of the United States and were placed at APHIS's quarantine facility, but they were subsequently "refused entry into the United States" and ultimately euthanized—or, as federal law describes it, "destroy[ed]"—because several birds tested positive for Newcastle disease. ECF No. 13-1; *see* ECF No. 25, at 3 ("The birds at issue were neither

moving or moved interstate nor had they been imported *and* entered into commerce."); 7 U.S.C. §§ 8303, 8306 (referring to the power to "destroy" animals). This distinction matters because federal law differentiates between animals that enter the United States and are subsequently destroyed, and those that are imported and destroyed prior to—or otherwise refused—entry.

Specifically, Section 8303 governs "[r]estriction[s] on importation or entry." 7 U.S.C. § 8303. Congress has vested the Secretary of Agriculture with discretion to promulgate regulations for "post-importation quarantine" to assess whether any animal "imported or entered . . . is or may be affected by any . . . disease of livestock." *Id.* § 8303(b)(2). By regulation, every "lot of pet birds," "research birds," and "commercial birds and zoological birds" that is "imported into the United States shall be quarantined for a minimum of 30 days." 9 C.F.R. § 93.106(a). The Secretary may, in addition to imposing quarantine requirements, "order the destruction or removal from the United States of . . . any animal . . . that has been imported but has not entered the United States" if "destruction or removal . . . is necessary to prevent the introduction into or dissemination within the United States of any [such] disease." 7 U.S.C. § 8303(c)(1)(A). Section 8303 does not authorize the Secretary to indemnify importers for the value of animals that must be destroyed or removed. *See generally id.* § 8303.

In contrast, Section 8306 governs "[s]eizure, quarantine, and disposal" of any animal that (1) "is moving or has been moved in interstate commerce or has been imported and entered" and that the United States and the Secretary believes is or was sick with or exposed to any "disease of livestock at the time of movement," *id.* § 8306(a)(1); (2) "is moving or is being handled, or has moved or has been handled, in interstate commerce in violation of [7 U.S.C. §§ 8301-8322]," *id.* § 8306(a)(2); (3) "has been imported, and is moving or is being handled or has moved or has been handled, in violation of [7 U.S.C. §§ 8301-8322]," *id.* § 8306(a)(3); or (4) "is not being

maintained, or has not been maintained, in accordance with any post-importation quarantine, post-importation condition, post-movement quarantine, or post-movement condition in accordance with [7 U.S.C. §§ 8301-8322]," *id.* § 8306(a)(4). Unlike Section 8303, Section 8306 directs the Secretary of Agriculture to "compensate the owner of any animal . . . that the Secretary requires to be destroyed under this section." *Id.* § 8306(d)(1). But Congress has prohibited the Secretary from making a "payment" pursuant to Section 8306 for "any animal . . . *that is refused entry under this chapter*." *Id.* § 8306(d)(3)(C) (emphasis added). That prohibition plainly covers birds—like Mr. Padgett's hornbills—that have been refused entry because of the Secretary's regulations implementing Section 8303. *See id.* § 8302(16) (defining "this chapter" to "include[] any regulation or order issued by the Secretary under the authority of this chapter"); ECF No. 13-1 (the Department of Agriculture's letter to Mr. Padgett explaining that the hornbills had been "refused entry into the United States" pursuant to 9 C.F.R. § 93.106).

Two features of Sections 8303 and 8306 bear repeating, as they demonstrate why Mr. Padgett has no right, let alone a clear and indisputable one, to an appraisal or the processing of any indemnity application. First, as noted, Section 8303 contains no mention of compensation for owners based on the value of animals destroyed due to importation restrictions. *See generally* 7 U.S.C. § 8303. In other words, nothing in the statute governing animal importation suggests that owners in Mr. Padgett's position—those with imported birds that never entered the United States—have a right to indemnification. Second, while the Secretary must compensate owners for animals destroyed under Section 8306, that section prohibits payment for animals refused entry under Section 8303 or 9 C.F.R. § 93.106. 7 U.S.C. § 8306(d)(3) ("No payment shall be made by the Secretary under this subsection for . . . (C) any animal . . . that is refused entry under this chapter[.]"); *cf.* ECF No. 12, at 5-6 (concluding that Mr. Padgett had failed to show a likelihood

of success on the merits of his claim that Defendants violated the APA by exterminating his hornbills because the Secretary has authority to order the destruction of imported birds that have not entered the United States). The plain text and statutory context of Section 8303 and Section 8306 render 9 C.F.R. § 53.3 and its related regulations inapplicable to birds that were refused entry into the United States and then destroyed while in post-importation quarantine. *See Sierra Club v. Wheeler*, 956 F.3d 612, 616-17 (D.C. Cir. 2020) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (alteration in original) (quoting *Util. Air. Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 320 (2014))); *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that 'regulations, in order to be valid, must be consistent with the statute under which they are promulgated.'" (quoting *United States v. Larionoff*, 431 U.S. 864, 873 (1977))). That is because the regulatory appraisal requirement and indemnity process exist to implement the Section 8306 compensation directive for which Mr. Padgett is ineligible.[2]

Notwithstanding the statutory limitations on compensation under Section 8306(d)(3)(C), Mr. Padgett maintains that the regulations in 9 C.F.R. § 53.1 *et seq.* supply him with clear and indisputable rights to an appraisal and APHIS's processing of his indemnity application. He cites no case favorably interpreting these regulations or applying them to similar facts. *See generally*

[2] Mr. Padgett suggests in his reply brief that "compensation [is] available to [him] under 7 U.S.C. § 8308(b)(1)," ECF No. 25, at 5, which allows the Secretary to "pay a claim arising out of the destruction of any animal . . . consistent with the purposes of this chapter," 7 U.S.C. § 8308(b)(1). But "new arguments made in a reply brief are forfeited." *Conservation Force v. Jewell*, 160 F. Supp. 3d 194, 204 n.4 (D.D.C. 2016). Even if the court were to consider the argument, Mr. Padgett would get no closer to locating clear and indisputable rights in the appraisal and indemnity regulations by invoking Section 8308's compensation provision, which does not plainly require payment based on market value. Section 8308 therefore does not clearly and indisputably entitle Mr. Padgett to an appraisal of his euthanized hornbills and the processing of an indemnity application.

ECF Nos. 23, 25. Instead, he cites only the plain text of the regulations, asserting that "there are no exceptions at all to the appraisal requirement" because 9 C.F.R. § 53.3(a) contains "no caveat concerning [a bird's] import/entry status." ECF No. 25, at 5.[3] That is true, but irrelevant. As the court has explained, *see supra* pp. 8-11, the appraisal requirement and indemnification process implement Section 8306's compensation scheme for which Mr. Padgett is categorically ineligible, 7 U.S.C. § 8306(d)(3)(C). Put differently, 9 C.F.R. § 53.3(a) need not distinguish between "import/entry status" because the *only* animals eligible for appraisal and indemnification are those that have not been denied entry into the country. Basic principles of administrative law squarely foreclose the implication of Mr. Padgett's argument—that, notwithstanding Section 8306's prohibition on market-based payments for "imported [animals] . . . [that were] affected with or exposed to any . . . disease . . . at the time of movement" and subsequently refused entry into the United States, 7 U.S.C. § 8306(a)(1), (d)(3)(C); *see id.* § 8302(12)(A) (defining "move" to include "import," among other things), the Secretary has, by regulation, entitled Mr. Padgett to a market-based assessment and compensation procedure for birds fitting that profile, *see United Airlines, Inc. v. Transp. Sec. Admin.*, 20 F.4th 57, 62-63 n.3 (D.C. Cir. 2021) ("To the extent that the [agency's] regulation . . . may conflict with the statute, 'the statute clearly controls.'" (quoting *Murphy v. Internal Revenue Serv.*, 493 F.3d 170, 176 n.* (D.C. Cir. 2007))). Accordingly,

---

[3] Mr. Padgett devotes most of his reply to the argument that the court should focus on Section 8303 because Section 8306 "is completely inapplicable." ECF No. 25, at 1-4, 7. Both parties—and the court—agree that Section 8303 governed the importation of Mr. Padgett's hornbills. It does not follow that Section 8306 has no force whenever Section 8303 has effect. Put differently, the statutory text defeats Mr. Padgett's assertion that Section 8306 kicks in only "*after* entry into commerce," *id.* at 2: the Agriculture Secretary has authority to destroy any imported animal that "may have been affected with or exposed" to any disease "at the time of movement," 7 U.S.C. § 8306(a)(1), or any animal "that the Secretary finds is not being maintained . . . in accordance with any post-importation quarantine," 7 U.S.C. § 8306(a)(4).

Mr. Padgett has no right—let alone a clear and indisputable one—to an appraisal or the processing of an indemnity claim. *Cf. Ferriero*, 60 F.4th at 714 ("[W]e will deny mandamus even if a petitioner's argument, though pack[ing] substantial force, is not clearly mandated by statutory authority or case law." (second alteration in original) (internal quotation marks omitted)). By the same logic, APHIS has no clear duty to act as Mr. Padgett contends it must. *See id.* at 715 (explaining that courts often analyze "the clear right to relief and clear duty to act requirements for mandamus 'concurrently'" (quoting *Lovitky*, 949 F.3d at 760)).

Aside from the incompatibility between the regulations Mr. Padgett cites and his ability to obtain relief under them, a separate set of regulations—for animal importation, which indisputably governed Mr. Padgett's efforts to import hornbills—confirm that the appraisal and indemnity regulations have no application here. *See* ECF No. 25, at 3 (asserting that Section 8303 applies); 7 U.S.C. § 8303(b) (authorizing the Secretary to promulgate regulations concerning animal importation); 9 C.F.R. §§ 93.100-93.106 (the governing regulations). While in "post-importation quarantine" pursuant to Section 8303, 7 U.S.C. § 8303(b)(2); *see* 9 C.F.R. § 93.106(a), several of the hornbills tested positive for Newcastle disease, ECF Nos. 13-1, 13-2. And once APHIS detected Newcastle disease, "all birds in the facility [were required to] be destroyed or refused entry." 9 C.F.R. § 93.106(c)(3)(ii)(E). Whereas 9 C.F.R. §§ 53.3(a) and 53.4(a) together require appraisals before killing an animal, the regulations for post-importation quarantine and the destruction of birds infected by or exposed to Newcastle disease neither direct APHIS to conduct a pre-euthanasia appraisal nor allow it to provide post-euthanasia compensation. *See id.* §§ 93.100-93.106. Accordingly, the plain text of Section 8306(d)(3)(C) and 9 C.F.R. § 93.106 undermine Mr. Padgett's claim that 9 C.F.R. § 53.3(a) clearly and indisputably applies to the

hornbills. The mandamus petition is thus inconsistent with the regulations and statutory provisions on which Mr. Padgett relies *and* the regulations that actually govern his situation.[4]

Finally, even if Mr. Padgett were correct that the appraisal and indemnity regulations apply to birds that never enter the United States, the court would deny the mandamus petition. The same "appraisal requirement" that, according to Mr. Padgett, entitles him to mandamus requires only *pre*-euthanasia appraisal. Mr. Padgett concedes as much. ECF No. 25, at 5 ("In fact, 9 C.F.R. § 53.3(a) commands an APHIS employee to appraise animals *before* destruction."); *see* 9 C.F.R. § 53.4(a) (providing that "animals infected with or exposed to disease shall be killed promptly after appraisal"). Nothing in Section 53.3(a) requires an appraisal under the circumstances here: Mr. Padgett's hornbills have already been destroyed and he asks the court to order APHIS to belatedly assess the birds' value. *See* ECF No. 24, at 7. Lacking support from the relevant statutory scheme, the federal regulations governing importation of birds, and any favorable precedent, Mr. Padgett cannot meet his burden to justify granting his mandamus petition. Accordingly, any amendment to add a mandamus claim would be futile.

---

[4] To be sure, the post-importation quarantine regulation provides that "other Federal laws and regulations . . . shall also apply as applicable to the quarantine facilities." 9 C.F.R. § 93.106(e). But the regulation specifically cross-references various animal-welfare provisions as examples of "other" regulations that apply to quarantine facilities—none of which include the appraisal regulations that Mr. Padgett has cited. *See id.* (pointing to the Department of Agriculture's Animal Welfare Regulations, which are codified at 9 C.F.R. §§ 1.1-12.10).

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Mr. Padgett's Petition for Writ of Mandamus, ECF No. 23, is **DENIED**. It is further **ORDERED** that the parties shall file a joint status report on or before September 10, 2026, proposing next steps in this litigation.

**SO ORDERED.**

LOREN L. ALIKHAN
United States District Judge

Date: August 27, 2026